Lindsay G. Leavitt – 029110
Lleavitt@jsslaw.com
Haley A. Harrigan – 032620
hharrigan@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554
Telephone: (602) 262-5911

*Attorneys for Plaintiff Dr. Shina Zehnder, M.D.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dr. Shina R. Zehnder, M.D., a married woman,<br><br>Plaintiff<br><br>vs.<br><br>Mayo Clinic, a foreign nonprofit corporation dba Mayo Clinic School of Graduate Medical Education,<br><br>Defendant | No.<br><br>**COMPLAINT** |

Plaintiff Dr. Shina R. Zehnder, M.D. ("Dr. Zehnder") for her Complaint against Defendant Mayo Clinic, a foreign nonprofit corporation, dba Mayo Clinic School of Graduate Medical Education ("Mayo"), alleges as follows:

**INTRODUCTION**

1. This action arose because Mayo, a multi-billion-dollar nonprofit corporation, refuses to grant Dr. Zehnder's reasonable requests for workplace accommodations during the remaining three years of her Diagnostic Radiology residency, violating Title I of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Arizona Civil Rights Act.

**PARTIES, JURISDICTION AND VENUE**

2. Dr. Zehnder is a married woman, residing in Scottsdale, Arizona. She is

currently in the process of completing the first year of her Diagnostic Radiology residency at Mayo (the "Residency").

3. Mayo is a nonprofit corporation domiciled in Rochester, Minnesota.

4. Mayo individually, and/or through its affiliates, owns and operates a hospital campus in Scottsdale, Arizona, where Dr. Zehnder is currently employed as a Resident.

5. Upon information and belief, Mayo receives funding through grants from the Federal government and accepts payments via Medicare.

6. This lawsuit arises, in part, out of Mayo's violation of Title I of the ADA and Section 504 of the Rehabilitation Act.

7. Dr. Zehnder filed a Charge of Discrimination with the Equal Employment Opportunity Commission - Phoenix Division, and received a Notice of Right to Sue from the EEOC dated January 30, 2023.

8. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because Dr. Zehnder's claims arise under federal law.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Dr. Zehnder's claim occurred in this District.

## FACTUAL BACKGROUND

### Dr. Zehnder's Disabilities

10. Dr. Zehnder has a number of disabilities, including Autism Spectrum Disorder with cognitive/emotional rigidity, impairments in pragmatic language, and emotional reactivity. This is additionally complicated by Anxiety Disorder Unspecified, Attention Deficit Hyperactivity Disorder, and Chronic Post Traumatic Stress Disorder.

11. Notwithstanding the foregoing disabilities, Dr. Zehnder graduated with two Bachelor's degrees from Arizona Statute University, *Summa Cum Laude,* and with

a Doctor of Medicine (M.D.) from the University of Rochester School of Medicine and Dentistry, finishing in the top 10% of her class. She was even elected to the Alpha Omega Alpha medical honor society.

12. While the above disabilities affect her speech, thoughts, and emotions, Dr. Zehnder is not seeking accommodations from Mayo for those disabilities. Rather, she is requesting accommodations for her *physical* limitations caused by Hypermobile Ehlers-Danlos Syndrome complicated by Generalized Dysautonomia with multisystem end-organ manifestations (the "Physical Disabilities").

13. The Physical Disabilities were monitored closely by Deborah P. Healy, M.D.—a Clinical Professor in the Department of Psychiatry at the University of Rochester Medical Center, and board-certified internist with a subspecialty certification in Hospice and Palliative Medicine—during Dr. Zehnder's 12-month Transitional Residency Program at Riverside Health System.

14. Dr. Healy observed Dr. Zehnder's "physiological response to varying degrees of circadian dysregulation during transitions between rotations" and consequently acquired a firm understanding of the accommodations Dr. Zehnder will need to preserve her health and working capacity over a longer Residency program.

15. Specifically, Dr. Healy observed that when Dr. Zehnder's body experiences "sleep dysregulation" (caused by varying work hours) it led to "behavioral modification and medication-refractory insomnia."

16. Refractory insomnia occurs when three different treatment options for insomnia are unsuccessful.

17. In other words, disruption to Dr. Zehnder's regular sleep patterns causes an observable inability to restore normal sleep patterns for a prolonged period.

18. In turn, changes to her sleep patterns worsen her problems with bowel dysmotility, migraine headaches, and autonomic dysfunction with specific manifestations (including POTS symptomology).

19. POTS is a condition that causes orthostatic intolerance, which is the inability to remain upright without symptoms such as lightheadedness, palpitations, fatigue, blurred vision, chest discomfort, cognitive impairment, and syncope.

20. In other words, changes to her sleep patterns will cause Dr. Zehnder to suffer such severe disabilities that it will render her unable to function and perform her responsibilities as a Resident at Mayo in a safe and competent manner.

21. Importantly, Dr. Healy noted that these symptoms (caused by erratic sleep patterns) took as long as two months to fully normalize after comparatively brief periods of circadian disruption caused by after-hours shift assignments lasting up to two weeks.

## The Request for Accommodations

22. On March 19, 2022, several months before beginning her Residency at Mayo's Scottsdale campus, Dr. Zehnder contacted Mayo and requested the following accommodations for her disabilities (collectively the "Request for Accommodations"):

- No shift ending later than 22:00;
- Minimum of 10 hours, 30 minutes between consecutive shifts;
- No shift greater than 14 hours in length;
- Where feasible, assignment of late work hours on a day preceding a regularly-scheduled day off; and
- Permission to wear footwear that allows for needed plantarflexion.

23. In support of her Request for Accommodations, Dr. Zehnder submitted, among other items, the following documentation to Mayo: (1) Completed Request for Accommodations form; (2) Medical Provider Verification of Disability; (3) Letters from three medical doctors endorsing the requested accommodations; and (4) supplemental written rationale for the requested accommodations.

24. Over the next several months, Dr. Zehnder corresponded with several employees at Mayo about her Request for Accommodations, primarily Kara James, the

Disability and Accommodations Resource Specialist.

25. As set forth in her initial request and corresponding documentation, Dr. Zehnder communicated that the Request for Accommodations were made to ensure that she receive adequate sleep to avoid issues with circadian regulation because of her Physical Disabilities.

26. Dr. Zehnder also communicated a willingness to work with Mayo administrators to develop accommodations that were acceptable to both her and Mayo.

27. Despite a program start date of July 1, 2022, Mayo was slow to respond to Dr. Zehnder's Request for Accommodations and she was in limbo as late as June 2022 about whether Mayo would provide the accommodations necessary for her to complete her Residency.

28. Finally, on June 28, 2022, the Office of Wellness & Academic Support issued a letter *denying* the Requests for Accommodations for years 2 through 4 of the Residency.

29. By failing to grant her Request for Accommodations, Mayo has denied Dr. Zehnder access to all but the first year of her four-year Residency.

30. Dr. Zehnder is scheduled to start the second year of her Residency on July 1, 2023.

31. On January 20, 2023, Mayo's counsel communicated that Mayo's "residency program needs to move forward with planning for the next year of the program that begins in July."

32. In other words, Dr. Zehnder's schedule for Year 2 of her Residency is already being prepared by Mayo, with no consideration for her Request for Accommodations.

33. In denying Dr. Zehnder's Request for Accommodations, Mayo represented that working night shifts was an "essential element" of the Residency; that modifications to the schedule would cause a "fundamental alteration" to the substance

of the residency curriculum, and would be an "undue hardship" to Mayo.

34. Mayo did not, and still has not, explained how working night shifts is an "essential element" of the program or how modifying a resident's schedule could be a "fundamental alteration" of the program or constitute an "undue hardship"—especially in light of the fact that Mayo was already planning on adding a full-time overnight staff radiologist position to take effect well in advance of the third and fourth years of her residency, and that even without her participation there would still be nine (9) radiologist residents available to cover night-shifts during Year 4 of her residency, whereas every previous year Mayo only had eight (8) residents available for overnight shifts.

35. Mayo even suggested and/or encouraged Dr. Zehnder to leave her Residency with Mayo and apply to other programs that may be willing to grant her Request for Accommodations.

36. In the meantime, Mayo publicly released a statement touting itself as "one of the best places to work for people with disabilities" and that it scored "100% on the Disability Equality Index."

37. Dr. Zehnder and her husband moved from Virginia to take a Resident position with Mayo and have purchased a home in Scottsdale.

38. To uproot their lives again would be devastating, not only to them but to Dr. Zehnder's Scottsdale-based parents, who were looking forward to Dr. Zehnder's support while her father battles a cancer diagnosis.

## ACGME Standards

39. The Accreditation Council for Graduate Medical Education (ACGME) is a private, not-for-profit organization that sets standards for U.S. graduate medical education (residency and fellowship) programs and the institutions that sponsor them, and renders accreditation decisions based on compliance with these standards.

40. The ACGME accredits Sponsoring Institutions and Residency and

Fellowship programs (like Mayo's), confers recognition on additional program formats or components, and dedicates resources to initiatives addressing areas of import in graduate medical education.

41. Accreditation is achieved through a voluntary process of evaluation and review based on published accreditation standards.

42. Importantly, the ACGME does *not* contain any requirements that residents work nights shifts in order to complete their Residency.

43. Rather, the ACGME provides that a Residency must ensure that (1) the Resident moves towards unsupervised practice, and (2) the assessment includes "resident ability to take an independent call."

44. In other words, Mayo's insistence that Dr. Zehnder work night shifts has no basis in national accreditation standards.

45. Mayo has no legitimate reason (related to adequacy of residency training) to deny Dr. Zehnder's Request for Accommodations.

46. The night shifts imposed by Mayo, by themselves, are not essential to prepare Dr. Zehnder to be a diagnostic radiologist.

<u>ACGME Program Requirements for Diagnostic Radiology</u>

47. The ACGME has recently updated and revised its "Program Requirements for Graduate Medical Education in Diagnostic Radiology" (the "Requirements").

48. The Requirements provide a "conceptual framework describing the required domains for a trusted physician to enter autonomous practice." *See* Section § IV.B.

49. The Requirements provide that Dr. Zehnder (and, consequently, Mayo's residency program) must meet the following *core competencies* to be adequately prepared for autonomous practice: Professionalism; Patient Care and Procedural Skills; Medical Knowledge; Practice-based Learning and Improvement; Interpersonal

and Communication Skills; and Systems-based Practice.

50. Importantly, there is no requirement that a resident work *night-shifts* in order to meet any of the above-listed core competencies.

51. In fact, the ACGME's only reference to evening work is found in § IV.C.5.b)(1), which provides that it is a core competency for "[r]esident participation in on-call activities, including being on-duty after-hours and on weekends or holidays, which should occur throughout PGY-3-5."

52. Dr. Zehnder's Request for Accommodations satisfies the core competency requirement that she participate in "on-call activities" without jeopardizing her (or her patients') health and well-being.

53. Regarding health and well-being, the ACGME recently revised the Requirements, acknowledging that its intent was to provide greater "flexibility within an established framework, allowing programs and residents more discretion to structure clinical education in a manner that optimizes patient safety, resident education, *and resident well-being." See* § VI.

54. To put it another way, the Requirements have been "expanded to include greater attention to…resident and faculty well-being…while also ensuring ethical, humanistic training."

55. The ACGME mandates that Mayo must adopt "policies and programs that encourage optimal resident and faculty member well-being." *See* § VI.C.1.d).

56. Mayo's refusal to grant Dr. Zehnder's Request for Accommodations has no basis in national accreditation standards, and in fact, will likely violate those same standards by jeopardizing Dr. Zehnder's "well-being" and the health and safety of her patients.

## COUNT I
**Americans with Disabilities Act – Disparate Impact**

57. Dr. Zehnder re-alleges the above paragraphs.

8716972v2(71370.1)

58. Title I of the ADA prohibits private employers from discriminating against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

59. Dr. Zehnder's Physical Disabilities constitute a disability under the ADA.

60. Dr. Zehnder is a "qualified individual" under the ADA because she is properly credentialed and can perform the essential functions of the Residency. In fact, her latest reviews given by Mayo's attending physicians after her first rotation contained the following:

- A very find job during a difficult starting rotation. Very bright, great questions and great progress! A pleasure.
- She does an excellent job and performs at or above expected level in all areas.
- Her knowledge base of BIRADS and breast disease truly ranks amongst the best of all residents that have rotated through our division.
- She is very detail oriented and very serious about learning. She is meticulous in reporting, and has superior retention of teaching points.
- She showed excellent professionalism throughout the rotation, well above average. Her professionalism will serve her well in her career.
- She was incredibly prepared and highly engaged in the rotation.
- She came early, stayed late, and was clearly very prepared each day. She is obviously reading and her breast imaging knowledge base is excellent for a first year resident.

61. Due to her Physical Disabilities, however, Dr. Zehnder is unable to work night shifts.

62. Disparate-impact claims involve employment practices that are facially

neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.

63. Under a disparate-impact theory of discrimination, a facially neutral employment practice may be deemed illegally discriminatory without evidence the employer's subjective intent to discriminate.

64. Mayo's employment practices (during years two through four of a Diagnostic Radiology residency) of requiring that all residents work "night call" shifts, and other overnight or late night shifts is discriminatory to individuals, like Dr. Zehnder, who suffer from physical disabilities that prohibit them from doing so without jeopardizing her (and her patients') health and safety.

65. Mayo's employment practices, if enforced as currently implemented will result in Dr. Zehnder being physically unable to complete her residency with Mayo.

66. Dr. Zehnder seeks injunctive relief, including an order that Mayo make its residency program accessible to Dr. Zehnder by granting her Request for Accommodations.

## COUNT II
### Americans with Disabilities Act – Failure to Accommodate

67. Dr. Zehnder re-alleges the above paragraphs.

68. Dr. Zehnder's Physical Disabilities constitute a disability under the ADA.

69. Dr. Zehnder is a "qualified individual" under the ADA because she is properly credentialed and can perform the essential functions of the Residency. In fact, her latest reviews given by Mayo's attending physicians after her first rotation contained the following:

- A very find job during a difficult starting rotation. Very bright, great questions and great progress! A pleasure.
- She does an excellent job and performs at or above expected level in all areas.

- Her knowledge base of BIRADS and breast disease truly ranks amongst the best of all residents that have rotated through our division.
- She is very detail oriented and very serious about learning. She is meticulous in reporting, and has superior retention of teaching points.
- She showed excellent professionalism throughout the rotation, well above average. Her professionalism will serve her well in her career.
- She was incredibly prepared and highly engaged in the rotation.
- She came early, stayed late, and was clearly very prepared each day. She is obviously reading and her breast imaging knowledge base is excellent for a first year resident.

70. Dr. Zehnder submitted her Request for Accommodations in March 2022.

71. Mayo denied her Request for Accommodations in June 2022.

72. The parties, through counsel, have engaged in follow-up discussions since Mayo's denial in June 2022, but Mayo unreasonably refuses to grant her Request for Accommodations.

73. Dr. Zehnder's Request for Accommodations was reasonable.

74. Mayo's failure to provide reasonable accommodations to Dr. Zehnder constitutes unlawful discrimination under the ADA.

75. Mayo's violation of Dr. Zehnder's rights under the ADA caused Dr. Zehnder to suffer emotional harm, distress, and anxiety.

76. Mayo's failure to comply with the ADA was intentional and/or reckless, thus triggering punitive damages.

77. Dr. Zehnder is entitled to her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

78. Dr. Zehnder is also seeking injunctive relief, including an order requiring that Mayo grant her Request for Accommodations.

## COUNT III
### Rehabilitation Act

79. Dr. Zehnder re-alleges the above paragraphs.

80. Section 504 of the Rehabilitation Act provides that no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under any program or activity that receives Federal financial assistance.

81. Dr. Zehnder's Physical Disabilities constitute disabilities under the Rehabilitation Act.

82. Upon information and belief, Mayo is subject to the Rehabilitation Act because it accepts Federal grants and Medicare.

83. Dr. Zehnder is Dr. Zehnder is a "qualified individual" under the Rehabilitation Act because she is properly credentialed and can perform the essential functions of the Residency. In fact, her latest reviews given by Mayo's attending physicians after her first rotation contained the following:

- A very find job during a difficult starting rotation. Very bright, great questions and great progress! A pleasure.
- She does an excellent job and performs at or above expected level in all areas.
- Her knowledge base of BIRADS and breast disease truly ranks amongst the best of all residents that have rotated through our division.
- She is very detail oriented and very serious about learning. She is meticulous in reporting, and has superior retention of teaching points.
- She showed excellent professionalism throughout the rotation, well above average. Her professionalism will serve her well in her career.
- She was incredibly prepared and highly engaged in the rotation.
- She came early, stayed late, and was clearly very prepared each day. She is obviously reading and her breast imaging knowledge base is excellent for a first year resident.

84. Mayo's deliberate indifference (and refusal to accommodate) Dr. Zehnder's disabilities by granting her Request for Accommodations constitutes a violation of the Rehabilitation Act.

85. Mayo's violation of Dr. Zehnder's rights under the Rehabilitation Act caused, and will continue to cause, Dr. Zehnder to suffer compensatory damages.

86. Dr. Zehnder is also entitled to her reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 794(a)-(b).

87. Dr. Zehnder also seeks and, is entitled to, declaratory and injunctive relief, including an order requiring that Mayo grant her Request for Accommodations.

## COUNT IV
**Arizona Civil Rights Act**

88. Dr. Zehnder re-alleges the above paragraphs.

89. Dr. Zehnder has one or more disabilities as defined by A.R.S. § 41-1461(5)(a).

90. Dr. Zehnder is qualified to perform the essential functions of her Residency.

91. A.R.S. § 41-1463(B)(1) makes it unlawful for any employer to discriminate against any individual with respect to the individual's terms, conditions, or privileges of employment on the basis of disability.

92. Mayo violated A.R.S. § 41-1463(B) by refusing to accommodate Dr. Zehnder's disabilities in the workplace.

93. Dr. Zehnder is seeking declaratory and injunctive relief, including an order requiring that Mayo grant her Request for Accommodations and reimburse her attorneys' fees and costs pursuant to A.R.S. § 41-1481(G)(J).

WHEREFORE, Dr. Zehnder prays for judgment against Mayo as follows:

(a) An order or declaratory relief, declaring that Mayo discriminated against Dr. Zehnder pursuant to state and federal law;

(b) A preliminary and permanent injunction against Mayo to (1) enjoin Mayo from discriminating against Dr. Zehnder during years 2 – 4 of her diagnostic radiology residency, (2) grant Dr. Zehnder's Request for Accommodations;

(c) An award of compensatory damages in an amount to be determined at trial;

(d) An award of punitive damages pursuant to federal law;

(e) An award of reasonable attorneys' fees and costs pursuant to state and federal law;

(f) An award of pre and post-judgment interest, at the highest rate as allowable by law; and

(g) An award of such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 27th day of February, 2023.

                                    JENNINGS, STROUSS & SALMON, P.L.C.

                                    By *s/Lindsay G. Leavitt*
                                            Lindsay G. Leavitt
                                            Haley A. Harrigan
                                            One East Washington Street
                                            Suite 1900
                                            Phoenix, Arizona  85004-2554
                                            *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

☒    I hereby certify that on February 27, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

                                            *s/ Rebecca C. Lewis*
                                            Rebecca C. Lewis