**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Shina R Zehnder, | No. CV-23-00355-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Mayo Clinic, et al., | |
| Defendants. | |

This case arises from Defendant Mayo Clinic Arizona's ("Defendant") alleged discrimination towards Plaintiff Shina Zehnder ("Plaintiff") on account of her sleep dysregulation disabilities. Plaintiff and Defendant have each filed Motions for Summary Judgment. (Docs. 104 & 105). Plaintiff seeks partial summary judgment on the issue of liability related to her discrimination claims. (Doc. 105 at 13–15, 17). Defendant seeks summary judgment on all of Plaintiff's claims. (Doc. 104 at 7–10, 12, 15, 16–17). These Motions are fully briefed. (Docs. 110–113). The Court grants Defendant's Motion and enters judgment on Plaintiff's claims for the following reasons.[1]

## I.      Background[2]

Plaintiff is a medical doctor who works as a resident for Defendant in its Radiology Department. (Doc. 105 at 4; Doc. 104 at 2). During their second and third years of

---

[1] Both parties have requested oral argument in this matter. (Docs. 104, 105). The Court denies the requests because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

[2] The following facts are undisputed, unless stated otherwise.

residency at Mayo, radiology residents spend six weeks each year on an Interventional Radiology ("IR") rotation.  (Doc. 104-1 at 106).  During this rotation, the residents work an eight to ten-hour, Monday through Friday schedule and are also on at-home call for six nights during the six-week rotation until the following morning.  (*Id*.)  A resident on an IR rotation also works and serves on-call three days on the weekend.  (*Id*.)

During their third and fourth years, residents work a night shift rotation—commonly referred to as a graveyard shift—running from 9:00 p.m. to 7:00 a.m. for seven days. (*Id*.) They work five weeks of night shift per year in their third year and eight weeks of night shift per year in their fourth year. (*Id*.)  The residents on these graveyard shifts have fourteen hours until the start of their next shift.  (*Id*. at 38–39).

Before her residency started, on March 19, 2022, Plaintiff requested accommodations related to her night shift duties due to her physical limitations believed to be caused by Hypermobile Ehlers-Danlos Syndrome ("EDS") complicated by Generalized Dysautonomia with multisystem end-organ manifestations.  (Doc. 105 at 6).  She states that sleep dysregulation impairs her physiological system to the point where she is unable to perform major life activities such as sleep, stand upright, think, see clearly, and have regular bowel movements.  (*Id*. at 5).  Plaintiff's treating physician noted that these symptoms can take as long as two months to fully normalize after comparatively brief periods of circadian disruption caused by after-hours shift assignments.  (*Id*.)  Due to these alleged disabilities, Plaintiff asked Defendant to make the following accommodations:

- That none of her shift end later than 22:00;

- That there be a minimum of 10 hours, 30 minutes between her consecutive shifts;

- That she not be assigned to a shift longer than 14 hours;

- That where feasible, assignment of late work hours get scheduled on a day preceding a regularly scheduled day off;

- That she have permission to wear footwear that allows for needed plantarflexion; and

- That she have routine scheduled meetings, at pre-determined intervals with

supervisors, to provide explicit expectations and discuss feedback.

("Proposed March 2022 Accommodations") (Doc. 104 at 4; Doc. 105 at 5–6; Doc. 104-3 at 57).  On June 6, 2022, Plaintiff also asked that she be allowed to have a minimum of 8 hours of sleep per 24-hour period and a schedule that allows for very gradual adjustments to sleep wake hours.  (Doc. 104-3 at 89).  She also suggested scheduling her overnight work at the end of her residency but said that she would then need a period of medical leave or a fixed schedule if that were to occur.  (*Id*. at 37–38).

Defendant responded to Plaintiff's March 2022, request for accommodations on June 28, 2022, through its Disability and Accommodations Resource Specialist, Ms. Kara James, and proposed allowing Plaintiff to schedule her night shifts in consecutive six-day weeks and allowing her time off before and after her rotation to ramp up and down to the new schedule.  (Doc. 104-4 at 23; Doc. 104-3 at 103).  Defendant stated that the emergency radiology rotation runs from 5:00 pm to midnight for four weeks and to help her adjust to the night shift, this rotation could be done immediately before her six weeks night shift.  (Doc. 104-3 at 102).  Defendant also agreed to some of Plaintiff's accommodations, such as wearing footwear that allows for needed plantarflexion, i.e., high heels.  (Doc. 105-8 at 2).  It denied her other accommodations related to her night shift rotation, however.  (*See id*.)

On December 2, 2022, through counsel, Plaintiff rejected Defendant's proposed allowable accommodations as they were not "reasonable accommodations" for Plaintiff's disabilities, and she asked for the accommodations she sought in March of 2022.  (Doc. 104-3 at 105).  On December 23, 2022, Defendant declined to grant Plaintiff's proposed March 2022 accommodations, but said that it would slightly modify the hours of her emergency radiology rotation "assuming other residents in the program are willing to cover the scheduled hours in exchange for your willingness to alleviate some of those residents' other duties."  (Doc. 104-3 at 112).  Defendant also agreed to other accommodations such as taking unpaid leave to provide relief.   Defendant also re-iterated that it needs residents to be present overnight to provide patient care.  (*Id*.)  Plaintiff did

not respond to Defendant's offer and instead filed the instant action. (Doc. 104-4 at 77).

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission - Phoenix Division and on January 30, 2023, received a Notice of Right to Sue from the EEOC.  (Doc. 1 at ¶ 7).  She then filed her Complaint on February 27, 2023 (*Id.*)

Plaintiff's Complaint alleges claims against Defendant for: disparate impact under the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA") (Doc. 1 at ¶¶ 57–66), failure to accommodate under the ADA (*Id.* at ¶¶ 67–78), refusal to accommodate under the Rehabilitation Act, 29 U.S.C. § 794 (*Id.* at ¶¶ 79–87) and disability discrimination under the Arizona Civil Rights Act ("ACRA") (*Id.* at 88–93).  Plaintiff seeks the following relief:

- A preliminary and permanent injunction against Defendant to enjoin it from discriminating against Plaintiff during years 2–4 of her diagnostic radiology residency;
- An order granting Plaintiff's request for accommodations;
- Compensatory damages and punitive damages; and
- An award of reasonable attorneys' fees and costs.

(*Id.* at 13–14).  After filing her Complaint, Plaintiff also asked that she be permitted to complete her IR rotation at St. Joseph's hospital in Phoenix through Creighton Medical School's Radiology Residency because Creighton does not require that its radiology residents perform a 24-hour call shift or night float shift.  (Doc. 105 at 6).

Both parties now move for summary judgment.

## II.   Legal Standard

A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party.  *Id.*  Courts do not

weigh evidence to discern the truth of the matter; they only determine whether there is a genuine issue for trial. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994). This standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id*. at 250–51 (citing *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949)).

The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute. *Celotex*, 477 U.S. at 323. Once shown, the burden shifts to the non-moving party, which must sufficiently establish the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail "merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323).

If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e). The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322. The summary-judgment stage is the " 'put up or shut up' moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events." *Arguedas v. Carson*, 2024 WL 253644, at *2 (S.D. Cal. Jan. 22, 2024) (citation omitted).

In fact, the non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in [its] favor." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III.     Discussion

Plaintiff asks the Court to find that Defendant's refusal to grant her requests for accommodation constitutes discrimination under the ADA, the Rehabilitation Act, and the ACRA. (Doc. 105 4–5). In that regard, she says she has met her summary judgment burden to prove that she (1) is disabled;[3] (2) is a qualified individual; (3) that the accommodations she sought were reasonable. She also says she has sufficiently proven that Defendant's night shift requirement creates a disparate impact on individuals with sleep dysregulation disabilities. She therefore asks the Court enter judgment as to Defendant's liability on these claims, and reserve only the issue of damages for trial. (Doc. 105 at 13–15, 17).

For its part, Defendant seeks summary judgment on all of Plaintiff's claims, arguing that she (1) she is a qualified individual under the ADA for her failure to accommodate claim; and (2) has offered no evidence to support her disparate impact claim. (Doc. 104 at 7–10, 12, 15). Defendant also raises two affirmative defenses: direct threat and business necessity. (Doc. 104 at 16–17).

### A.     Plaintiff is not a Qualified Individual

Plaintiff argues that she can meet her burden to prove that she is a qualified individual because she has the required credentials and medical training necessary to be a medical resident and that the night shift is not "an essential function" of her residency. (Doc. 105 at 15). Defendant argues Plaintiff is not a qualified individual because residents must be able to participate in "safe, effective and compassionate healthcare" per Defendant's job description. (Doc. 104 at 11). It further argues that, by Plaintiff's own

---

[3] Plaintiff argues that she is disabled (Doc. 105 at 13), and Defendant does not dispute this. (*See* Doc. 110).

admission, if she were sleep-deprived for *any* reason, she would endanger patients. (*Id*. at 12).  The Court finds that Plaintiff is not a qualified individual because the night shift is an essential function of Defendant's residency program.

"Claims under the ADA, Rehabilitation Act, and ACRA are evaluated using the standards set forth for ADA claims."  *Merkley v. Maricopa Cnty. Cmty. Coll. Dist*., 2006 WL 8440535, at *2 (D. Ariz. June 29, 2006) (citing *Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895, 899 n.3 (D. Ariz. 1997) (consolidating analysis of ADA, Rehabilitation Act, and ACRA claims); *see also* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA].").  Accordingly, the analysis of Plaintiff's failure to accommodate claim under the ADA, the Rehabilitation Act and the ACRA can all be evaluated using the standards for discrimination set forth under the ADA.  *See Merkley*, 2006 WL 8440535, at *2. As noted, Plaintiff claims that Defendant has violated these statutes for failing to make reasonable accommodations and under a disparate impact theory.

Title I of the ADA prohibits an employer from discriminating "against a ***qualified individual*** on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The ADA defines discrimination, among other things, as "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  *Id*. § 12182(b)(2)(A)(ii).  Similarly, a failure to provide reasonable accommodations can also constitute discrimination under the Rehabilitation Act.  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).  However, a disabled individual is not entitled to whatever modification she thinks might accommodate her limitations.  Nor is she entitled to obtain an advantage over her non-disabled peers.  Rather, the ADA and the

Rehabilitation Act mandate that institutions make only those reasonable modifications that are *necessary* to give a disabled individual the same opportunity to obtain the offered benefit that she would have had were it not for the limitations caused by her disability—and, even then, only to the extent that the necessary modifications *would not fundamentally alter* the nature of that benefit. *See Long v. Howard Univ.*, 439 F. Supp. 2d 68, 76 (D. D.C. 2006).

To establish that Defendant failed to accommodate her disability, Plaintiff must demonstrate: "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of h[er] disability." *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (2003). The term "qualified individual" under the ADA means: "[A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The Ninth Circuit has set forth a two-step inquiry to make this determination. *See Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127–29 (9th Cir. 2020) (citing 29 C.F.R. § 1630.2(m)). First is the determination whether "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires." *Id.* Second, "whether, 'with or without reasonable accommodation,' the individual is able to 'perform the essential functions of such position.'" *Id.* (citation omitted). If a disabled person cannot perform a job's essential functions, even with a reasonable accommodation, the ADA's employment protections do not apply. *Cripe v. City of San Jose*, 261 F.3d 877, 884–85 (9th Cir. 2001).

The burden falls on the employee to demonstrate that she can perform the essential functions of a job with or without a reasonable accommodation. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). However, the employer has the burden of establishing what job functions are essential, *see Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012), because "much of the information which

determines those essential functions lies uniquely with the employer." *Bates v. United Parcel Svc., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc).

Defendant does not dispute that Plaintiff is disabled, that it receives federal financial assistance, or is an employer. Rather, Defendant argues that Plaintiff's ADA claim cannot proceed to trial because Plaintiff is not a qualified individual.

The relevant inquiry here is whether Plaintiff could perform the duties of a full-duty medical resident. *See Valli v. Mayorkas*, 707 F. Supp. 3d 980, 996 (S.D. Cal. 2023). Defendant argues that, under step one, Plaintiff cannot satisfy the job-related requirement of working the night shift without being a danger to patients. (Doc. 110 at 4). It also argues that, at step two, the night shift is an essential function of the job. (*Id*. at 5). Whether the night shift is "an essential function of the job" is the crux of this issue, so, the Court will begin with step two and determine whether Defendant, with or without reasonable accommodations, can perform the essential functions of the radiology residency. *See Beem v. Providence Health & Servs.*, 2012 WL 1579492, at *2 (E.D. Wash. May 4, 2012) ("first, a court inquires as to the job's essential functions, after which the plaintiff must establish that she can perform those functions with or without reasonable accommodations.").

### 1.       The Night Shift is an Essential Function of the Residency

Again, the burden to establish that the night shift is an essential function of medical residents is on Defendant. *Samper*, 675 F.3d at 1237. Defendant argues that the night shift is a vital and fundamental part of developing the skills needed to become an independent radiologist. (Doc. 105 at 15). Defendant further states that "[r]equiring residents to work Night Shifts serves two purposes: 1) it helps Mayo provide patient care as the hospital operates around-the-clock every day and night; and 2) it is vital to educating and training the resident to become an independent, functioning radiologist with experience in active patient management." (Doc. 110 at 5). Plaintiff argues that the night shift is not an essential function of her residency since it makes up only six-percent of her total experience. (Doc. 105 at 15). Plaintiff also argues that Defendant's staffing of "nighthawk" radiologists, emergency radiologists who staff alongside the residents on

1  night shift, cuts against a finding that the night shift is essential for residents since there is
2  adequate coverage.  (Doc. 111 at 14).

3        A job's essential functions are "fundamental job duties of the employment position
4  . . . not includ[ing] the marginal functions of the position." *Bates*, 511 F.3d at 991 (quoting
5  29 C.F.R. § 1630.2(n)(1)).  " 'Essential functions' are not to be confused with 'qualification
6  standards,' which an employer may establish for a certain position."  *Id*.  Essential
7  functions are "basic duties," while qualification standards are "personal and professional
8  attributes that may include 'physical, medical [and] safety' requirements. The difference is
9  crucial." *Id*.

10       The EEOC regulations cite several reasons for including a job function "essential,"
11 including: (i) the reason the position exists is to perform that function; (ii) a limited number
12 of employees available among whom the performance of that job function can be
13 distributed; and/or (iii) the function may be highly specialized so that the incumbent in the
14 position is hired for his or her expertise or ability to perform the particular function.
15 29 C.F.R. § 1630.2(n)(2).  Evidence of what is essential includes:

> (i)    The employer's judgment as to which functions are essential;
> (ii)   Written job descriptions prepared before advertising or interviewing
>        applicants for the job;
> (iii)  The amount of time spent on the job performing the function;
> (iv)   The consequences of not requiring the incumbent to perform the
>        function;
> (v)    The terms of a collective bargaining agreement;
> (vi)   The work experience of past incumbents in the job; and/or
> (vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); *see also* 42 U.S.C. § 12111(8).  Where there is a "conflict in the
evidence regarding the essential functions of [a position], we conclude that there is a factual
dispute . . . notwithstanding the job descriptions that [an employer] has prepared." *Rohr v.
Salt River Project Agric. Imp. & Power Dist*., 555 F.3d 850, 864 (9th Cir. 2009) (quoting
*Cripe v. City of San Jose*, 261 F.3d 877, 888–89 (9th Cir. 2001)).

       Medical residencies are accredited by the Accreditation Council for Graduate
Medical Education ("ACGME"), and ACGME sets the standards for residencies in the

United States. (Doc. 104 at 3; Doc. 105 at 8). ACGME sets forth common program requirements for each type of program but gives discretion to the program in designing how it operates and trains its residents. (Doc. 104-1 at 37). ACGME expects residents to participate in "on-call activities, including **being on-duty after-hours** and on weekends or holidays" throughout their second, third, and fourth years of residency. (*Id.*) (emphasis added). The ACGME program requirements for Graduate Medical Education in Diagnostic Radiology also state that "[r]elief from after-hours duty granted to residents at the program director's discretion, should not exceed three months preceding the ABR Core Examination." (Doc. 104-1 at 76). Defendant says it begins to work its radiology residents in Emergency Medicine during their second year to prepare them for the "more demanding" night shift rotations they are expected to complete in years three and four. (Doc. 104 at 2; Doc. 104-1 at 106). Defendant states that the IR and night shift rotations are essential functions of the job, and that no resident has ever been excused from these rotations. (Doc. 104 at 5).

The Director of Defendant's diagnostic radiology residency program, Dr. Michael Fox, notes that ACGME gives deference to the program in designing how it operates and trains its residents but provides a "conceptual framework" which all accredited residency programs must operate. (*Id.* at 37). Defendant's "Resident Handbook" provides after hours assignments for each year of residency. (Doc. 104-1 at 106). Residents are expected to work five weeks of the night shift in their third year and eight weeks in their fourth year. (*Id.*) These shifts stretch from 9:00 pm to 7:00 am Friday to Thursday on the weeks in which residents work the night shift. (*Id.*)

The Court finds that Defendant has established that the night shift is a "basic duty" of its radiology residents, so, it is an essential function. *See Bates*, 511 F.3d at 991. The Board which accredits all residencies in the United States specifically requires after hours participation by residents, although not a graveyard shift *per se*. (Doc. 104-1 at 76). Defendant, who has discretion over its residency program, requires residents to complete several weeks of night shifts in their third and fourth years of residency. (Doc. 104-1 at

106).  Defendant's residency handbook states that:

> To demonstrate an ability to perform satisfactorily on "independent call"
> which is an ACGME requirement, our program provides for the R2 residents
> to take short call and weekend call. These rotations are 4 and 10–11 hours
> shifts, respectively. The experiences from these shifts, coupled with the R2
> emergency radiology rotation, help prepare the resident to make independent
> judgements about imaging exams with rapid faculty feedback. This
> preparation is necessary for the resident to perform satisfactorily on the R3
> and R4 night float rotations. The night float rotations are as close to
> functioning "independently" as is possible in our program. At all times,
> faculty are available if needed remotely; however, the residents are to
> become comfortable with providing preliminary interpretations that are later
> reviewed by subspecialty faculty to gain confidence and, become prepared
> to function as an independent radiologist.

(*Id*. at 106).  Thus, not only is the night shift an essential job function, it is also how Defendant chooses to meet ACGME's independent call requirements—the entity that accredits Defendant's residency program.  (*See id*.)

Furthermore, Defendant notes that they received over 700 applications for four radiology residency positions for the 2022 residency class.  (Doc. 101-1 at 37).  This shows that there are a limited number of available employees among whom the performance of that job function can be distributed and that the function is highly specialized so that the incumbent is hired for his or her expertise or ability to perform the particular function.  *See* 29 C.F.R. § 1630.2(n)(2)(ii–iii).  Indeed, as Defendant noted in its December 23, 2022, letter to Plaintiff, Defendant "need[s] residents to be present overnight to provide patient care."  (Doc. 104-3 at 112).  Since the night shift is an essential function of Defendant's radiology residency program, the burden shifts to Plaintiff to show that she can perform this essential function with or without reasonable accommodations.  *See Samper*, 675 F.3d at 1237 (noting that the employer has the burden of establishing what job functions are essential).

## 2. Plaintiff Cannot Perform the Essential Functions of her Residency With or Without Accommodations

Defendant argues that Plaintiff cannot perform this essential function with or

- 12 -

without reasonable accommodations because she cannot provide safe patient care on night shifts. (Doc. 104 at 14). Defendant notes that it treats and cares for patients twenty-four hours per day, 365 days and nights a year. (Doc. 104 at 11). In response, Plaintiff argues that the night shift is not necessary to her residency because "Supplements," or board-certified radiologists contracted by Mayo are available to cover those shifts. (Doc. 111 at 14). She says the Chair of Radiology testified that using a Supplemental to cover Plaintiff's night shifts would not be a financial burden and would not otherwise disrupt the program or her fellow residents (Doc. 105 at 16). This argument misses the mark. Employers are not required "to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1089 (9th Cir. 2006); *see also Samper*, 675 F.3d 1237 (noting that "[i]t is a rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual.") (citation omitted).

Here, Plaintiff's proposed accommodation would require a covering employee—contract or otherwise—to perform essential functions for Plaintiff, rather than assisting in the performance of such functions. *See Samper*, 675 F.3d at 1240 (refusing to allow a plaintiff to ask for a reasonable accommodation that exempts her from an essential function). Plaintiff seeks an accommodation that would effectively exempt her from an essential function—which is not a reasonable accommodation. *See id.* This evidence, viewed in a light most favorable to Plaintiff, affirmatively demonstrates that she cannot perform the essential functions of her residency with or without reasonable accommodations. *See Anthony*, 955 F.3d at 1127–29. So, the ADA's employment protections do not apply to her. *See Cripe*, 261 F.3d at 884–85.

Thus, because the Court finds that Plaintiff is not a qualified individual under the ADA, it must enter summary judgment on her failure to accommodate, Rehabilitation Act and ACRA claims. *See Merkley*, 2006 WL 8440535, at *2.

Next, the Court will address the parties' arguments on Plaintiff's disparate impact claim.

1

**B.      Disparate Impact**

2         Defendant argues that Plaintiff has failed to offer any evidence to support her

3   disparate impact claim because she has not shown that Defendant's required night shifts

4   exclude anyone, other than Plaintiff, from the job.  (Doc. 104 at 9).  Plaintiff argues that

5   Defendant's night shift policy is discriminatory on its face and that the effect of

6   Defendant's policies against schedule modifications for individuals with disabilities is

7   "obvious." (Doc. 111 at 17).  Plaintiff also moves for summary judgment on her disparate

8   impact claim and argues that Defendant's requirement that its residents work overnight

9   shifts unfairly and disproportionately impacts individuals who, like Plaintiff, suffer from

10  disabilities arising from sleep dysregulation.  (Doc. 105 at 17).

11         Under the ADA, a plaintiff may allege discrimination under the theories of disparate

12  treatment and/ or disparate impact.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

13  Relevant here, under a disparate impact theory, a plaintiff must show a neutral employment

14  practice fell more harshly on persons with disabilities. *See id*. at 52–53.  In essence, the

15  disparate impact theory is "a doctrinal substitute for preventing unprovable acts of

16  intentional discrimination hidden behind facially neutral policies." *Brasier v. Union Pac.*

17  *R.R. Co.*, 2023 WL 2754007, at *10 (D. Ariz. Mar. 31, 2023) (citing *EEOC v. Joe's Stone*

18  *Crab, Inc*., 220 F.3d 1263, 1274 (11th Cir. 2000)).

19         To establish a disparate impact claim under the ADA, Plaintiff must "(1) show a

20  significant disparate impact on a protected class or group; (2) identify the specific

21  employment practices or selection criteria at issue; and (3) show a causal relationship

22  between the challenged practices or criteria and the disparate impact." *See Bolden-Hardge*

23  *v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) (citation and internal

24  quotation marks omitted).

25         As Plaintiff notes, she can show a significant disparate impact on a protected class

26  or group with statistics or where the disparate impact is "obvious." *Bolden-Hardge v.*

27  *Office of the Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023).  Such

28  "obviousness" may exist where, for example, a policy "on its face" has a disparate impact

on a protected group, or where it has an impact on "all or substantially all" members of such group. *Id.* (citing *Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 813 (5th Cir. 1996)). For example, in *Hung Ping Wang v. Hoffman*, 694 F.2d 1146 (9th Cir. 1982), the Ninth Circuit held that a plaintiff pleaded a *prima facie* case where he alleged his employer's language-skills requirement would disproportionately affect minority applicants. *Bolden-Hardge*, 63 F.4th at 1227 (citing *Hung Ping Wang*, 694 F.2d at 1148–49). The court reasoned that "the requirement seem[ed] on its face to have a disparate impact on minority applicants, and [it] did not require the plaintiff to demonstrate that impact with statistics to avoid dismissal." *Id.*

As these cases discussed, Plaintiff has shown that Defendant's night shift policy disproportionately affects individuals with sleep dysregulation disabilities. *See Bolden-Hardge*, 63 F.4th at 1227. Plaintiff has demonstrated, at the very least, that genuine issues of material fact exist as to whether this neutral employment practice of requiring residents to work the night shift falls more harshly on persons with sleep related disabilities, and accordingly has established a prima facie case on this claim. *See Brasier*, 2023 WL 2754007, at *10.

However, Defendant argues that the night shift is a business necessity (Doc. 104 at 17), which is an affirmative defense to a disparate impact claim. *See Freyd v. Univ. of Or.*, 990 F.3d 1211, 1224 (9th Cir. 2021). Defendant has also raised a "direct threat" affirmative defense. *See* 42 U.S.C.S. § 12113(b). Defendant says that each or both of these affirmative defenses warrant summary judgment in its favor on Plaintiff's disparate impact claim. The Court finds that Defendant has demonstrated entitlement to its business necessity defense as a matter of law.

### C.  Business Necessity

Defendant argues that its night shift requirement meets patient care needs and measures the ability of the resident to become an autonomous radiologist. (Doc. 104 at 18). Defendant states that it treats tens of thousands of patients a year and operates around the clock, every day and night, and includes an Emergency Department. (*Id.* at 17). Plaintiff

argues that Defendant cannot establish its business necessity defense here because it has plenty of coverage from the nighthawk radiologists.  (Doc. 111 at 19).

The business necessity defense "permits employment practices that have a disparate impact on a protected class if the practices have 'a manifest relationship to the employment in question.' " *Bolden-Hardge*, 63 F.4th at 1228 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)).  Business necessity is a defense to a claim of discrimination where "an alleged application of qualification standards [] or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation."  42 U.S.C. § 12113(a).

Where "an across-the-board safety 'qualification standard' is invoked, the question then becomes what proof is required to be a qualified individual,' that is, one who can perform the job's essential functions."  *Bates v. UPS*, 511 F.3d 974, 989 (9th Cir. 2007).  "Before an employee can challenge an employer's qualification standard [] an employee must first prove that he is a 'qualified individual' within the meaning of the ADA, that is, one who can perform the job's essential functions with or without reasonable accommodation."  *Id.*

A defendant successfully asserts the business necessity defense where it shows that that "the qualification standard is (1) 'job-related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.' " *Id.* at 995 (quoting 42 U.S.C. § 12113(a)).  First, "[t]o show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job."  *Id.* at 996.  Second, "[t]o show that the disputed qualification standard is 'consistent with business necessity,' the employer must show that it 'substantially promote[s]' the business's needs." *Id.* (quoting *Cripe*, 261 F.3d at 890).  Last, "to show that 'performance cannot be accomplished by reasonable accommodation,' the employer must demonstrate either that no reasonable accommodation currently available would cure the performance deficiency

1   or that such reasonable accommodation poses an "undue hardship" on the employer." *Id.*
2   at 996–97.

3         "The 'business necessity' standard is quite high, and 'is not [to be] confused with
4   mere expediency.' " *Cripe*, 261 F.3d at 890 (quoting *Bentivegna v. United States Dep't of*
5   *Labor*, 694 F.2d 619, 621–22 (9th Cir. 1982)).   The standard requires employers to
6   demonstrate that qualification standards that discriminate against a class of disabled
7   employees are nevertheless permissible because it is necessary for the operation of the
8   employer's business.   *Id.*   Such a necessity must "substantially promote" the business'
9   needs.   *Id.*

10         Defendant has affirmatively demonstrated that no reasonable trier of fact could find
11   other than for it on its business necessity defense.   *Soremekun*, 509 F.3d at 984.   First, this
12   requirement is "job related" because of the residencies' dual role of educating residents
13   and treating patients.   Again, Defendant treats patients twenty-four hours per day, 365 days
14   per year.   (Doc. 104 at 11).   Dr. Amy Hara, Defendant's chair of Radiology, testified that
15   the night shift is "the closest that we can get to evaluating [the residents] as an independent
16   radiologist, which is what we certify them when they graduate from our program that they
17   could do this job independently."   (Doc. 104-1 at 33).   Dr. Hara confirmed that having
18   additional coverage from nighthawk radiologists does not change this overall experience.
19   (*Id.*)   Dr. Hara also stated that the afterhours components are "essential functions" of the
20   radiology residency.   (*Id.* at 5).   Defendant has further stated that it "need[s] residents to be
21   present overnight to provide patient care."   (Doc. 104-3 at 112).   Defendant uses the night
22   shift as a vital part of training future radiologists.   So, the night shift is job related.
23   *See Bates*, 511 F.3d at 989.

24         The night shift requirement is also consistent with business necessity because it
25   substantially promotes Defendant's need of having coverage at night for patients in need.
26   (*Id.* at 31).   It also promotes Defendant's need of certifying their residents upon graduation.
27   (*Id.* at 11).   The night shift is also how Defendant meets ACGME's independent call
28   requirements.   (*See* Doc. 104-1 at 106).   Having sufficient coverage at night and evaluating

1  its residents are consistent with business necessity, so, the night shift requirement

2  substantially promotes Defendant's needs.  *See Bates*, 511 F.3d at 989.

3         Finally, Plaintiff's performance cannot be accomplished by reasonable

4  accommodation.  As previously stated, employers are not required "to exempt an employee

5  from performing essential functions or to reallocate essential functions to other

6  employees." *Dark*, 451 F.3d 1089.  The Court also previously found that the night shift

7  requirement is an essential function of Defendant's radiology residency program.  *Supra*

8  Section III.A.  "In sum, Defendant's requirement that residents complete certain night shift

9  requirements is permissible because it is necessary for the operation of the employer's

10 business and substantially promotes its needs of treating patients and educating residents.

11 *Cripe*, 261 F.3d at 890.

12        Viewing the facts in a light most favorable to Plaintiff, the Court finds that

13 Defendant has affirmatively demonstrated that no reasonable trier of fact could find other

14 than for it on its business necessity affirmative defense, so, summary judgment is

15 appropriate here and Plaintiff's disparate impact claim fails.  *Soremekun*, 509 F.3d at 984.

16 Because the Court grants summary judgment on Defendant's business necessity defense,

17 it does not address its direct threat defense.

18        Accordingly,

19        **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 104) is

20 **GRANTED** and Plaintiff's Motion for Partial Summary Judgment (Doc. 105) is **DENIED**.

21 All of Plaintiff's claims are dismissed.  The Clerk of Court is kindly directed to enter

22 judgment in Defendant's favor and dismiss this action.

23        Dated this 30th day of September, 2024.

24

25                                            _____

26                                            Honorable Diane J. Humetewa
                                             United States District Judge
27

28