**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shina R Zehnder,<br><br>    Plaintiff,<br><br>v.<br><br>Mayo Clinic Arizona,<br><br>    Defendant. | No. CV-23-00355-PHX-DJH<br><br>**ORDER** |

Plaintiff Shina Zehnder ("Plaintiff") asks the Court to reconsider its Summary Judgment Order ("the MSJ Order") (Doc. 123) dismissing her claims against Defendant Mayo Clinic Arizona ("Mayo or Defendant"). (Doc. 129). Mayo has responded in opposition to Plaintiff's Motion. (Doc. 132). Plaintiff also seeks to supplement the evidentiary record in support of her Motion, which Defendant opposes.[1] (Docs. 136 & 138). The Court denies Plaintiff's Motion for Reconsideration for the following reasons.

**I.     Background[2]**

Plaintiff is a medical doctor who works as a resident for Defendant in its Radiology Department. (Doc. 105 at 4; Doc. 104 at 2). During their second and third years of

---

[1] Defendant argues that the Court should not consider Plaintiff's supplement because the evidence she presents is not "new." (Doc. 138 at 1). The Court will consider the additional evidence which Plaintiff has advanced in support of her Motion as the issue currently before the Court is whether Plaintiff's purported "newly discovered evidence" warrants a reversal of the Court's MSJ Order. (Doc. 136).

[2] The facts are fully set forth in the Court's MSJ Order and need not be wholly repeated here. (*See* Doc. 123).

residency at Mayo, radiology residents spend six weeks each year on an Interventional Radiology ("IR") rotation. (Doc. 104-1 at 106). During this rotation, the residents work an eight to ten-hour Monday through Friday schedule and are also on at-home call for six nights during the six-week rotation until the following morning. (*Id*.) A resident on an IR rotation also works and serves on-call three days on the weekend. (*Id*.)

During their third and fourth years, residents work a night shift rotation—commonly referred to as a graveyard shift—running from 9:00 p.m. to 7:00 a.m. for seven days. (*Id*.) They work five weeks of night shift per year in their third year and eight weeks of night shift per year in their fourth year. (*Id*.) The residents on these graveyard shifts have fourteen hours until the start of their next shift. (*Id*. at 38–39).

Before her residency started, on March 19, 2022, Plaintiff requested accommodations for her night shift duties due to her physical limitations believed to be caused by Hypermobile Ehlers-Danlos Syndrome ("EDS") complicated by Generalized Dysautonomia with multisystem end-organ manifestations. (Doc. 105 at 6). She stated that sleep dysregulation impairs her physiological system to the point where she is unable to perform major life activities such as sleep, stand upright, think, see clearly, and have regular bowel movements. (*Id*. at 5). Plaintiff's treating physician noted that these symptoms can take as long as two months to fully normalize after comparatively brief periods of circadian disruption caused by after-hours shift assignments. (*Id*.) Due to these alleged disabilities, Plaintiff asked Defendant to make the following accommodations:

- That none of her shift end later than 22:00;
- That there be a minimum of 10 hours, 30 minutes between her consecutive shifts;
- That she not be assigned to a shift longer than 14 hours;
- That where feasible, assignment of late work hours get scheduled on a day preceding a regularly scheduled day off;
- That she have permission to wear footwear that allows for needed plantarflexion;
- That she have routine scheduled meetings, at pre-determined intervals with supervisors, to provide explicit expectations and discuss feedback.

("Proposed March 2022 Accommodations") (Doc. 104 at 4; Doc. 105 at 5–6; Doc. 104-3

at 57).  On June 6, 2022, Plaintiff also asked that she be allowed to have a minimum of 8 hours of sleep per 24-hour period and a schedule that allows for very gradual adjustments to sleep and wake hours.  (Doc. 104-3 at 89).  She also suggested scheduling her overnight work at the end of her residency but said that she would then need a period of medical leave or a fixed schedule if that were to occur.  (*Id*. at 37–38).

Defendant responded to Plaintiff's March 2022, request for accommodations on June 28, 2022, through its Disability and Accommodations Resource Specialist, Ms. Kara James, and proposed allowing Plaintiff to schedule her night shifts in consecutive six-day weeks and allowing her time off before and after her rotation to ramp up and down to the new schedule. (Doc. 104-4 at 23; Doc. 104-3 at 103).  Defendant stated that the emergency radiology rotation runs from 5:00 pm to midnight for four weeks and to help her adjust to the night shift, this rotation could be done immediately before her six weeks night shift.  (Doc. 104-3 at 102).  Defendant also agreed to some of Plaintiff's accommodations, such as wearing footwear that allows for needed plantarflexion, i.e., high heels.  (Doc. 105-8 at 2).  It denied her other accommodations related to her night shift rotation, however.  (*See id*.)[3]

On December 2, 2022, through counsel, Plaintiff rejected Defendant's proposed allowable accommodations as they were not "reasonable accommodations" for Plaintiff's disabilities, and she asked for the original accommodations she sought in March of 2022. (Doc. 104-3 at 105).  On December 23, 2022, Defendant declined to grant Plaintiff's proposed March 2022 accommodations, but said that it would slightly modify the hours of her emergency radiology rotation "assuming other residents in the program are willing to cover the scheduled hours in exchange for your willingness to alleviate some of those residents' other duties."  (Doc. 104-3 at 112).  Defendant also agreed  to other accommodations such as taking unpaid leave to provide relief.  Defendant also re-iterated that it needs residents to be present overnight to provide patient care.  (*Id*.)  Plaintiff did

---

[3] After filing her Complaint on February 27, 2023, Plaintiff also asked that she be permitted to complete her IR rotation at St. Joseph's hospital in Phoenix through Creighton Medical School's Radiology Residency because Creighton does not require that its radiology residents perform a 24-hour call shift or night float shift. (Doc. 105 at 6).

- 3 -

not respond to Defendant's offer and instead filed her Complaint. (Doc. 104-4 at 77).

Plaintiff's Complaint alleged claims against Defendant for: disparate impact under the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA") (Doc. 1 at ¶¶ 57–66), failure to accommodate under the ADA (*Id*. at ¶¶ 67–78), refusal to accommodate under the Rehabilitation Act, 29 U.S.C. § 794 (*Id*. at ¶¶ 79–87) and disability discrimination under the Arizona Civil Rights Act ("ACRA") (*Id*. at 88–93).

Both parties moved for summary judgment, and the Court entered summary judgment in Defendant's favor. Specifically, the Court found that Plaintiff (1) was not a "qualified individual" under the ADA because she could not do her job with or without a reasonable accommodation, i.e., she could not perform the night shift; and (2) the night shift is a business necessity, providing Defendant with a dispositive affirmative defense. (Doc. 123 at 6, 15). The finding that Plaintiff was not a qualified individual necessitated summary judgment on her ADA, Rehabilitation Act, and ACRA claims because these claims are all evaluated using the standards set forth for ADA claims and a plaintiff must show that they are a "qualified individual able to perform the essential functions of the job with reasonable accommodation." *Merkley v. Maricopa Cnty. Cmty. Coll. Dist*., 2006 WL 8440535, at *2 (D. Ariz. June 29, 2006) (citing *Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895, 899 n.3 (D. Ariz. 1997) (consolidating analysis of ADA, Rehabilitation Act, and ACRA claims); *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (2003). Now, Plaintiff argues she has "newly discovered evidence" that warrants a reversal of the Court's MSJ Order. (Doc. 129).

## II.     Legal Standard

Federal Rule of Civil Procedure 59 provides that a party may move "to alter or amend a judgment" or dismissal with prejudice within 28 days after the order or judgment is entered. Fed. R. Civ. P. 59(e). Because Rule 59(e) does not identify "specific grounds for a motion to amend or alter. . . , the district court enjoys considerable discretion in granting or denying the motion." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (internal quotation marks and citation omitted). Caselaw generally recognizes that

a Rule 59(e) motion to alter or amend a judgment may be granted in four limited circumstances: (1) when necessary to correct manifest errors of law or fact upon which the judgment rests; (2) when necessary to present newly discovered or previously unavailable evidence; (3) when necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law. *Id.* Rule 59(e) may not, however, "be used to relitigate old matters, or to raise arguments or present evidence that could have been made prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted); *see also Banister v. Davis*, 590 U.S. 504, 508 (2020) (same); *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (noting that Rule 59(e) offers an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources") (internal quotation omitted); *Bollenbacher v. Comm'r of Soc. Sec.*, 621 F. Supp. 2d 497, 501 (N.D. Ohio 2008) (stating that a Rule 59(e) "motion is not a substitute for appeal and does not allow the unhappy litigant to reargue the case"). Nor should parties ask a court "to rethink what the court had already thought through—rightly or wrongly." *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995).

Indeed, disagreement with an order is an insufficient basis for reconsideration under Rule 59. *Ariz. Dream Act Coal. v. Brewer*, 945 F. Supp. 2d 1049, 1078 (D. Ariz. 2013). Such disagreements should be dealt with in the normal appellate process. *See Ramsey v. Arizona*, 2006 WL 2711490, at *1 (D. Ariz. Sept. 21, 2006). Denial of a motion for reconsideration under Rule 59(e) will not be reversed absent a showing of abuse of discretion. *See Allstate Ins. Co.*, 634 F.3d at 1111. Thus, the moving party has a "high hurdle" in order to obtain post-judgment relief. *See Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001).

**III.  Discussion**

In her Motion for Reconsideration, Plaintiff states that she underwent a medical procedure to alleviate a previously undiagnosed medical syndrome, May-Thurner

syndrome,[4] in June of 2024 and that her health has improved. (Doc. 129 at 1–2). She clarifies that she has not been "fully cured" but that "she can be medically cleared to complete the (1) Emergency Radiology rotation as currently scheduled, and (2) the Night Float rotation, so long as Mayo provides her with a reasonable accommodation." (*Id*. at 2). Due to this "new evidence" in the form of a new medical condition and treatment, Plaintiff argues that the Court should reconsider its finding that she is not a qualified individual as the facts supporting this decision have changed. (*Id*.) She also argues that the Court did not specifically address the on-call portion of the IR rotation.

Defendant argues in response that Plaintiff's "new evidence" is unsupported, this "new evidence" should have been disclosed before the Court issued its MSJ Order, and Plaintiff's Motion recycles the same arguments that the Court has addressed. (Doc. 132 at 1–3).

### A. Plaintiff's Evidence is Not Newly Discovered

To support a motion for reconsideration of a grant of summary judgment based upon newly discovered evidence, the movant must show both that the proffered evidence was newly discovered or unknown to it until after the Court's disposition, and that the evidence could not with reasonable diligence have discovered and produced prior to its disposition. *Frederick S. Wyle Professional Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985). Plaintiff has not shown either.

Plaintiff's Complaint alleged that she had a sleep disorder, Hypermobile Ehlers-Danlos Syndrome complicated by Generalized Dysautonomia with multisystem end-organ manifestations, which prevented her from working night shifts without an accommodation. (Doc. 1 at ¶ 12). She initially requested accommodations based on these disorders and complications and Mayo made its accommodation decisions based on these allegations. (Doc. 104-4 at 23; Doc. 104-3 at 103). Both parties based their summary judgment arguments on these facts. (*See* Docs. 104 & 105).

---

[4] Plaintiff was diagnosed with May-Thurner syndrome, a condition that interrupts blood flow through the legs, on April 5, 2024, and underwent an endovascular stent placement for treatment on June 13, 2024. (Doc. 129 at 3–4).

Likewise, on September 30, 2024, the Court issued its MSJ Order based on the record evidence before and available to it at the time. (Doc. 123). At no time prior to its resolution did Plaintiff ask the Court to stay its ruling to account for any developments or changes to these facts. Despite knowledge of her June 2024 medical procedure, subsequent improvement, and her then communications with Mayo regarding her new accommodation requests, Plaintiff did not seek to supplement the record with this evidence until after the Court had ruled on the pending dispositive motions.

Plaintiff says this information "could not have been disclosed to the Court any sooner because it took four months of monitoring her health data before Dr. Zehnder felt confident that she could revisit her requests for accommodation." (Doc. 129 at 2). The Court disagrees. Plaintiff should have supplemented the record much earlier than it did as she was diagnosed with May-Thurner syndrome months before the Court issued its MSJ Order. *See Cooper v. Tokyo Elec. Power Co., Inc*., 166 F. Supp. 3d 1103, 1116 (S.D. Cal. 2015), *aff'd*, 860 F.3d 1193 (9th Cir. 2017) ("A party may not raise new arguments or present new evidence [on reconsideration] if it could have reasonably raised them earlier."). As Defendant notes, the Federal Rules of Civil Procedure require timely supplementation, and both parties supplemented their disclosures while the motions for summary judgment were pending. (Doc. 132 at 2 citing Fed. R. Civ. P. 26(e)). Plaintiff's delay in bringing "new evidence" to the Court's attention does not show reasonable diligence on her part and the Court declines to amend its judgment on the facts that were fairly before it at that time. Because Plaintiff could have and should have presented this evidence earlier in the litigation, the Court will not grant her Motion. *See Wereb v. Maui Cnty*., 830 F. Supp. 2d 1026, 1031 (D. Hawai'i 2011) ("reconsideration may not be based on evidence and legal arguments that a movant could have presented at the time of the challenged decision") (citing *Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)); Fed. R. Civ. P. 59(e).

To be clear: the Court's finding that Plaintiff is not a qualified individual is based solely on the facts and conditions that existed *at the time of the Court's Order*. In her

Motion, Plaintiff suggests that Defendant is "reneging" on a subsequent accommodation agreement she made with Defendant following her June 2024 procedure. That grievance certainly was not before the Court at the time it issued its Order, however, and Rule 59(e) does not provide the means or justification for the Court to take the extraordinary step of amending its judgment to account for the changed circumstances Plaintiff's "new evidence" may present or any agreement the parties may have had that was unknown to the Court. *See Banister*, 590 U.S. at 508 (noting that in keeping with its "corrective function, federal courts generally have used Rule 59(e) only to reconsider matters properly encompassed in a decision on the merits") (cleaned up, internal citations omitted).

Now, three years after her initial accommodation request and denial, she seeks amendment of an unfavorable judgment on the grounds that "new evidence" would have changed that outcome. But Plaintiff's proposed "new evidence" completely changes the factual basis of Plaintiff's claims, as *none* of the information, despite being in Plaintiff's possession, was before the Court at the time of its ruling.[5] Plaintiff's "new evidence" arose too late in the proceedings and is too varied from her prior claims to suggest either party considered it in their summary judgement arguments. Other district courts in this circuit have refused similar requests as the purported new evidence "is too far removed in time to be relevant to the circumstances surrounding" the adverse employment action. *Evans v. Univ. Med. Ctr.*, 2019 WL 1049382, at *4 (D. Nev. Mar. 5, 2019) ("Events several years subsequent to Plaintiff's termination do not bear directly on whether Plaintiff's termination was pretextual, and thus are not new evidence as regards Plaintiff's case."). The Court will similarly refuse Plaintiff's reconsideration request because the "new evidence" she

---

[5] Indeed, the symptoms associated with May-Turner syndrome appear to significantly differ from those described in her Complaint. *Compare* Plaintiff's Complaint (Plaintiff "is requesting accommodations for her physical limitations caused by Hypermobile Ehlers-Danlos Syndrome complicated by Generalized Dysautonomia with multisystem end-organ manifestations . . . disruption to [her] regular sleep patterns causes an observable inability to restore normal sleep patterns for a prolonged period.") (Doc. 1 at ¶ 12) *with May-Thurner Syndrome*, CLEVELAND CLINIC (last updated Sept. 7, 2022), https://my.clevelandclinic.org/health/diseases/17213-may-thurner-syndrome ("May-Thurner syndrome is a condition that affects blood flow. It occurs when the right iliac artery, which sends blood to your right leg, presses on the left iliac vein, which carries blood from your left leg to your heart.").

advances is too attenuated from her original claims and the associated arguments she advanced at the summary judgment stage. *See id.*

### B. The "Night Shift" encompasses both the "Night Float" and "IR on-call" shifts

Plaintiff also states that the MSJ Order did not address whether the overnight pager call shifts during the IR rotation are an essential function of Dr. Zehnder's employment. (Doc. 129 at 7). It did.

Both parties conflated the Night Float and IR shifts at certain points in their briefing by referring to both in conjunction as "the Night Shift." Consequently, so did the Court. Mayo used the "Night Shift" to discuss the "Night Float" as well as the "on-call component of the IR rotation" in its MSJ by stating that:

> From both patient-care and educational perspectives, ***the resident position exists to perform Night Shifts***. While residents train during the day, the ACGME requires residents to work on-call, after-hours, and weekends throughout their second, third, and fourth years. ***Mayo has opted to use the Night Float as opposed to the more demanding schedule of having residents work 24 hours on-site up to every third day***. On Night Shifts, residents help provide care to patients, and the hospital treats and cares for patients 365 days and nights a year. From 9:00 p.m. to 7:00 a.m., the Night Float resident is the only licensed radiologist at the hospital. That resident performs any patient-needed basic procedures, provides preliminary exam interpretations, handles contrast coverage, and is on-site and available to advise other physicians or technicians about patient care issues. Working Night Shifts is also critical to the resident's professional training. Those shifts substantially increase residents' efficiency, speed, ability to triage, and confidence in working across all subspecialities.
>
> . . .
>
> For example, ***the on-call component of the IR rotation*** affords residents the opportunity to work on more complex procedures, where the patient acuity is much higher, e.g., embolizing a bleeding patient. Ex. 6 at 67:22-70:1; 72:3-73:20. ("every procedure done at night or after hours is considered urgent"). ***Exempting Dr. Zehnder from Night Shifts will compromise her training.***

(Doc. 104 at 10–12). This quote exemplifies that the "Night Shift" was used by Mayo to describe both the "Night Float" as well as the "on-call component of the IR rotation." (*See id.*)

- 9 -

Plaintiff's Response to Defendant's Summary Judgment Motion did attempt to parse out the "Emergency Radiology," "Interventional Radiology" and "Night Float" shifts. She addressed each shift in its own section under the essential function argument. (*See* Doc. 111 at 13–15). However, in her own Motion for Partial Summary Judgment, she addresses the "Night-float and Night-call shifts" in one section. (Doc. 105 at 10). She also refers to "overnight shifts" generally when arguing that "Mayo's requirement that its residents work overnight shifts unfairly and disproportionately impacts individuals who, like Dr. Zehnder, suffer from disabilities arising from sleep dysregulation." (*Id*. at 17).

In addressing Defendant's essential function argument, the Court noted that "Defendant states that the IR and night shift rotations are essential functions of the job, and that no resident has ever been excused from these rotations." (Doc. 123 at 11). The Court then found that "Defendant has established that the night shift is a 'basic duty' of its radiology residents, so, it is an essential function." (*Id*.) The Court addressed both the "night Float" and the "on-call component of the IR rotation" under the umbrella of the "Night Shift" in the Order—just as the parties had. (*See id*.) In sum, the Court sufficiently addressed "the Night Shift" as an essential function of the Interventional Residency in the MSJ Order. This is also not a basis for amending the Court's Judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion to Supplement (Doc. 136) is **GRANTED**, however, her Motion for Reconsideration (Doc. 129) is **DENIED**.

Dated this 25th day of June, 2025.

_____
Honorable Diane J. Humetewa
United States District Judge